First case this morning, AMR-American Airlines against LAM 109-2109. Counsel, please. Good morning, Your Honors. May it please the Court, my name is Brian McCarty. I am an attorney. I represent the plaintiff appellant in this case, AMR-American Airlines. Now, Your Honors, we are here before you on appeal seeking review of the Cook County Circuit Court Judgment Order upholding the decision of the Illinois Workers' Compensation Commission. Now, specifically, the commission affirmed the arbitrator's decisions finding that defendant's conditions of ill-being relative to his left knee, his bilateral hands and wrists, and his lower back were causally related to a March 6, 2003, accident while he was working for American Airlines. Specifically, Your Honors, the Circuit Court held that the decision of the Illinois Workers' Compensation Commission was not against the manifest weight of the evidence. Keep your voice up, please. Very good, Your Honor. Now, there are two specific issues for review, Your Honors. First, of course, whether the decision of the Workers' Compensation Commission is, in fact, against the manifest weight of the evidence. And secondly, whether the decision of the Circuit Court of Cook County in affirming that decision that defendant's bilateral hands and wrist condition was, in fact, related to the March 6, 2003, accident was not barred by the doctrine of res judicata. So first, I will go forth with the issue relative to the defendant's left knee. Now, it's clear based on the record that Petitioner did have some prior left knee complaints before this alleged March 6, 2003, accident. In fact, he had had surgery back in 1998 and had several MRIs indicating a prior ACL tear or a suspicion of a prior ACL tear. In fact, when he did undergo surgery back in 1999, obviously predating our accident, there was no ACL tear found. Now, to clarify, the employer is not disputing that the claimant was injured at work on March 6, 2003? No. That's not in dispute? That is not in dispute. With specific reference to, okay, following the March 6, 2003, accident, obviously he had another MRI. That MRI also showed a suspicion of an ACL tear. Now, obviously going back to the prior MRIs and the prior surgery, you have a very similar situation where there's a suspicion of an ACL tear, but actually the best way to go in and find out whether or not there actually is one is to go in and look at it surgically. When they did that, they did not find one. So it would seem to me that the subsequent ACL suspicion of a tear following the March 6, 2003, accident is of little probative value. Now he had preexisting conditions involving many parts of his body, it seemed like. But wasn't he symptom-free prior to the March 2003 accident? Wasn't he symptom-free for a while? It might have been for a short period of time, but specifically relative, and actually I'll get into it when we get into the bilateral hands and wrists, which is a little bit more apparent. But specifically, he did continue to have, obviously, issues with his left knee. Dr. Luke, who is a treating physician who actually treated him before the March 6, 2003, accident, as well as before and after, indicated to him that he had some very early signs of arthritis and he may need a total knee replacement in the future. So obviously there was some issues ongoing prior to the March 6, 2003, accident that would lead us to believe that certainly he had preexisting issues, but that they had not really resolved itself totally prior to the March 6, 2003, accident. All right. So along comes Luke. Luke opines that the claimant's knee condition was causally connected to the March 2003, accident, correct? He did in his testimony, yes. And you had the employer's expert said it was an act? That's correct. And the commission believed Luke? I'm sorry? The commission apparently believed Luke? That is apparent based on the decision, yes. Okay. So why is this, tell us why this is against the manifest way of the evidence, then? This is against the manifest way of the evidence based on not only his testimony, but Dr. Luke's records indicate that he thought that it was from a different source. Obviously he has these preexisting conditions. Furthermore, with respect to his initial complaints following the March 6, 2003, accident, he didn't indicate any specific knee pain. He indicated some pain that went down the posterior part of his leg down into his ankle. What do you mean when you say Luke thought it was from a different source? Not necessarily a different source. I think I misstated that. A newer source, yes. Essentially from the preexisting condition. He had already indicated to him that he had an early sign of arthritis. There was chondromalacia that was indicated in the MRI results, and therefore, you know, obviously this is a continuation of his preexisting issues, not related to any specific work accident. Now, and to kind of counter that as well, or to go on top of that, Dr. Gleason, who is the – Well, now, what knee are we talking about? The left knee, Your Honor. Well, what about in May and June, Luke's notes about left knee giving out complaint by the claimant? Yeah. Actually, he did state that, and furthermore, he indicated he didn't know why it was actually giving out at that point. And certainly one can really presume from the records and from the initial, from the initial surgery back in 1999 throughout up until the March 6, 2003 accident, and then obviously into 2005 and 2006, that he had continued issues. He doesn't really indicate, Dr. Luke doesn't really indicate during 2005 and 2006 where his, you know, what was the basis of his complaints and what was the cause of that knee giving out on him. Well, but why would he do that? Why would he indicate that he didn't know where it was coming from? Why would he indicate that he knew where it was coming from? He's treating a condition. Correct. Only lawyers worry about what caused the condition. Technically, I guess that would be correct. I guess he doesn't really care exactly what the cause of it was from. But I think it kind of does indicate that since he didn't know where it was coming from, and he obviously was aware of his preexisting conditions, his prior surgery, as well as the accident, he didn't really indicate whether or not it was coming from the accident specifically. Well, but that aside, we do have a patient who's getting a response by the doctor to the left knee area injury, bracing, et cetera. I mean, why is it not a reasonable inference that that happening after the accident, why is it not reasonable to infer that there's a relationship between the two by the commission, absent a statement by Luke? Sure. That would go into the respondent expert, Dr. Gleason. Dr. Gleason examined him, obviously indicated that he had some preexisting issues. They were all related to his prior issues relative to his knee back into 1999. And then as a result, what he did sustain on March 6, 2003, at most, was a sprain or a strain. When Dr. Gleason examined him, I believe it was April 20th of 2004, he indicated at that time that he was, he could return to work full duty, he was at MMI. Okay. So we've got Gleason saying it's just a temporary exasperation that he already had, that he presented himself with when he was with his employer. Correct. And that it's going to resolve itself. Correct. And it did. I think, yeah, he didn't really opine rather well to additional treatment. There was some treatment, some suparts injections, but he indicated that those were not related to any accident, but obviously his ongoing issues with the knee. Obviously he was going to need some further treatment relative to any, irregardless of any sort of accident. But it was not related. Does Luke ever in this record make a connection statement? I believe the only time he really makes any specific reference is during his evidence deposition. And is that not sufficient? It's not sufficient in this regard based on the medical records, his prior treatment, as well as the opinion from Dr. Gleason. That's a credibility finding, is it? Correct. I mean, it essentially is a, certainly from everything in its totality, and certainly from our standpoint, it is against the manifest weight of the evidence. Because you're saying that nobody could come to that conclusion based upon the underlying facts in the medical records. That is correct. By the very person who's making the statement of connection. I'm sorry? By the very person who's making the statement of connection. It's his records. You're indicating Dr. Luke. Yeah. So you really just, your whole case rests upon you got to undermine Luke. Relative to left knee, yes. Okay. And you did that by contrary opinion? Is that the basis for undermining Luke? Yeah. Contrary opinion, obviously. His review of the records, his review of Dr. Luke's records, there are some indications in Dr. Luke's records that obviously, as we indicated, that he was unsure why the knee was giving out. He initially indicated that, yes, he does have an ACL tear, and yes, this is in relation to the March 6, 2003 accident. After Dr. Gleason's examination of the defendant on April 20th of 2004, Dr. Luke changed his opinion. He says, okay, well, now it's not an ACL tear. I agree with Dr. Gleason. What is the argument you're making that the claims are barred under the doctrines of collateral estoppel and reticulatum? Yeah. This gets into his complaints of bilateral carpal tunnel syndrome. Can you, let me ask you a question. Can you receive compensation for aggravation of a preexisting ailment for which you have already recovered workers' compensation benefits? Yes. If there is, if it is proven that there's another subsequent accident that's causally connected to, you know, some sort of work activity. And it aggravates a condition, even though you've received workers' compensation benefits for that, you can receive benefits for the aggravation. I do believe that you can, so long as you prove your case. Specifically with this one, and it goes into your question as well, Your Honor, he had a prior injury with American Airlines back in October of 2001. And as a result of that injury, what was initially indicated was a right shoulder. Following the accident and during the subsequent treatment, he received, he received a diagnosis of bilateral carpal tunnel syndrome. So obviously this was known at the time of the injury, known at the time during treatment. The injury and the subsequent case that he filed against American Airlines was settled May 2nd of 2003. So that's approximately two months after the March 6, 2003 accident that we're here for today. Now, as a result of his, of that 2001 case, he settled the case. As indicated, it was known at that time during his treatment that he had bilateral carpal tunnel syndrome. Subsequently, there was a surgical recommendation by Dr. Luke for bilateral carpal tunnel release approximately nine months before the March 6, 2003 accident. Now, this court ruled in Rogers, we have very similar, similar facts here. Now, in this case here, he was paid under a lump sum settlement agreement for an injury to his right shoulder occurring on October 26th of 2001. Now, after that date of injury, as I've indicated, Dr. Luke had diagnosed him with bilateral carpal tunnel and cubital tunnel syndromes, as well as a left knee injury. Now, just as in the Rogers case, it is clear in this manner that both those injuries, being the bilateral carpal tunnel syndrome, was known at the time that the case was settled. Now, specifically relative to the... Was known at the time the case was settled. Correct. Was the claimant awarded benefits in this case upon injuries he sustained in the October 2001 accident? Yes, he was. He was, he had settled the case under a lump sum contract and was, was provided with compensation at that point. He was awarded benefits on the October 2001 accident, not the 2003 accident. Correct. Correct. What was he awarded benefits for in this case? Which accident? This, essentially this was tried on a 19B. So essentially the total compensation or the permanent partial disability compensation has not yet been resolved. Essentially this is an appeal based on the arbitrator's initial decision, the commission's decision upholding that decision, and then obviously the circuit court decision upholding that decision as well. So you're representing he got benefits for the very same accident in both claims. Is that what you're telling us? Not the very same accident, but the very same injury. He had this injury back in 2001, which continued. Obviously he still had the surgical recommendation by Dr. Luke even before the March 6, 2003 accident. So you're saying he has a condition after the settlement in 01, right, that was known at the time of settlement? Yes, it was known at the time of settlement. So you're saying the 03 incident, there's nothing to connect, to make a change in that condition? That is correct. And that is what Dr. Skink said. Dr. Skink was American Airlines expert relative to the bilateral hands. He examined and reviewed the EMG reports and the medical records both from 2001, the resulting treatment from 2001, as well as 2003. The EMG studies both before the March 6, 2003 accident and after, there was no change in either one. So essentially there's what I would certainly say continued treatment or continued at least condition of bilateral carpal tunnel syndrome following the October 2001 accident. So even assuming that's true, in response to his question, what about finding that the March 2003 incident aggravated the preexisting condition? Wouldn't that trigger a new claim? Wouldn't he still be entitled to make a new claim? If in fact it was causally related. Dr. Skink did not find that it was causally related. What did Dr. Luke find? I'm sorry? What did Dr. Luke find? Dr. Luke indicated that it was an exacerbation of a preexisting condition. And he actually released him from care for the earlier accident and determined that it had resolved? Quite frankly, I don't think there's any specific indication that he was ever truly released based on his bilateral carpal tunnel diagnosis from 2001. What did Luke testify to? I'm sorry? What did Luke testify to? Did he say it had been resolved? I believe he testified that it had been resolved. Well, I mean, why can't the Commission believe this? I mean, you've got contrary medical evidence, and the Commission's faced with contradictory medical evidence, and they chose to adopt the medical evidence that's favorable to the Petitioner. Okay? Understood. Certainly from our standpoint, based on the totality of the evidence from the 2001 all the way up until 2003 when he's alleging this accident, there is a surgical recommendation before the March 6, 2003 accident. Furthermore, the opinion of Dr. Skank indicating that there was no causal connection between that diagnosis and the March 6, 2003 accident. Essentially, all that in its totality would certainly lead to believe that the decision of the arbitrator and the decision of the Commission is, in fact, against the manifest way to the evidence. Now ---- Please complete your argument. I'm sorry? Please complete your argument. Very good, Your Honor. Just in totality, Your Honors, in this case, the defendant claimed injuries to his left knee and bilateral hands and wrists. However, the medical records in the testimony, both from Dr. Luke as well as Dr. Skank and Dr. Gleeson, reflect that he had preexisting issues that were not causally connected to the March 6, 2003 accident. And therefore, based on the totality of the evidence, the decisions of the Commission is, in fact, against the manifest way to the evidence. And we would ask that you overturn that decision. Thank you very much, Your Honors. We'll have time one more moment. Counsel, please. Thank you, Your Honors. Richard Victor on behalf of Mr. Lamb, counsel. It's a very straightforward manifest way question. It's clearly up to the Commission to decide conflicts between the medical evidence, between the experts. Mr. Lamb's testimony was unrebutted. We have Dr. Luke's testimony regarding his carpal tunnel condition, that as of October 24th of 2002, there was no Tonell's sign positive. As of October 31st, he was discharged without any surgical recommendation. You have Mr. Lamb's testimony that he had no symptoms at that time until the March 2003 accident. Hence, you have Dr. Luke's testimony and opinions that the accident aggravated the bilateral hand condition. There is obviously substantiation in Dr. Luke's clinical records prior to that to Mr. Lamb's testimony. Regarding his elbows, there were no prior symptoms on his elbows. There's no prior treating records regarding his elbows. So the doctor's testimony that his elbows were causally related to the accident is clear and unrebutted. With regard to the knee, it's a similar question. So regardless of whether there was an actual ACL tear, if you just talk about the knee condition itself, you have Dr. Scruggs' records the day after the accident documenting left knee complaints. You have Dr. Luke's testimony that given his clinical exams, the MRI findings, and the lack of immediate prior symptoms prior to the March 2003 accident, that the condition. Further, you have Mr. Lamb's testimony that in the days and weeks prior to the March 2003 accident, he was working and he did not have any particular symptoms regarding his left knee in the days and weeks prior to the accident. So you have a very straightforward manifest weight question. You have Dr. Luke's testimony that's based in fact, based on his own clinical exams both prior to the accident and subsequent to that. You have Mr. Lamb's unrebutted testimony. And the only thing you have on the other side is Respondent Sexford. It's clearly up to the commission to decide that conflict in Mr. Lamb's favor, and they did. What is your response to counsel's argument about that the upper extremity claims are a barrier to the doctrines of collateral estoppel and res judicata? What's your response to that? Certainly. It's not. You have an aggravation of a preexisting condition, which the, you have the medical expert, Dr. Luke, testifying it's closely related as an aggravation. We're not seeking to relitigate the 2001 claim for which he got, for which Mr. Lamb was compensated for a shoulder. Whether the fact that he had a bilateral hand condition was known at the time of that settlement is a spurious argument. He didn't recover specifically for that in the 2001 case, and going to your point, Your Honor, clearly an aggravation that you can prove through medical expert testimony is closely related as an aggravation is compensable in a new case. And that's what we have here. This is a reverse 19D proceeding. The man was getting compensation at the time of the hearing. Under the act, the employer was trying to stop those benefits through the use of their expert opinions. And the issues of ongoing TTA medical flow directly from this essential issue of causation. One last point, and that's the back that wasn't mentioned. You have the documents and complaints in Dr. Scruggs' records immediately following the accident, the day after and the week after, of back problems. You have Mr. Lamb's testimony of no other intervening accidents and a severe exacerbation of his pain following therapy. The employer tries to point to the fact that there was testimony at hearing that at the time of the hearing, Mr. Lamb did not have any particular back complaints. That doesn't go to the issue of causation between the injury and the treatment on the back. That would go to an issue of permanency, which was not raised in this reverse 19B proceeding. So it's clear that, and then plus you have Dr. Luke's testimony that the back was causally related to the accident. And all we're seeking to establish on the back was that the treatment he had was causally related, the treatment reasonable and necessary, and the bill should be awarded, which they were by the commission. It's a very straightforward manifest weight question. The employer has not proved in any way, shape or form that there is such a lack of sufficient evidence in the record. The opposite conclusion will be clearly apparent. And as everyone knows, that's the standard. Thank you. Thank you, counsel. Rebuttal, please. No rebuttal. Thank you, gentlemen. The court will take the matter under advisement for disposition.